Geo. G. Cobb and wife and James M. Jones and wife, caveators, plaintiffs in error, vs. Lawrence Battle, propounder and Executor, defendant in error.

[1.] The declarations of a testator before or after the execution of his will, are competent evidence to prove an attempt on his part to defeat the policy of the statutes forbidding the manumission of slaves. And a trust having that object may be established by such declarations without connecting the alleged trustee with the arrangement by other evidence.

Cobb et al. vs. Battle.

[2.] The third item of a will was as follows: " As the following named negroes, to wit, my house servant Adeline and her child Tolbert, have been good, trusty, and faithful servants to me, it is my wish and desire that the said Adeline shall not be separated from her child Tolbert; and it is my wish and desire, that my said nephew, Lawrence Battle, to whom I give them, shall treat them kindly, and see that they are as comfortably provided for as their condition in life and their conduct and behavior will justify. I wish him to treat them just as he may at all times think I would treat them if I were in life. This confidence I repose in him with the full assurance that it is not misplaced, and that it will not be abused." Though, on the surface, this language seems unobjectionable, yet, construed in the light of the parol evidence set out in the record, it might be held to cover up a trust.

[3.] There was, however, according to the evidence, a parol trust as to the two slaves here mentioned, and as to $20,000 intended as a provision for them; which trust being illegal and void, a partial intestacy was the consequence.

[4.] The whole will is not void, but so much only as is clearly involved in the attempted violation of the laws against manumission. The will cannot be regarded as one scheme, in the sense of our legislation, unless it has in purpose a unity which connects all its dispositions with a manumission project, or they are made to aid it or depend upon it.

[5.] The value, as evidence, of conversations or verbal statements when repeated in substance only, or after a part has been forgotten.

[6.] After a witness for the caveator has testified that he was on terms of friendship with the testator, that the latter often consulted him upon his affairs, and that he made to him certain communications touching his will, etc., it is competent for the propounder to prove that the testator was not friendly with the witness, and, from his manner of speaking of him, had no confidence in him.

[7.] Improbability of the theory that the testator, in the present case, made his entire will under the influence of a single motive, or to carry out but one purpose.

[8.] Testamentary dispositions, which, when the will was made and the testator died, were void as contravening the anti-manumission statutes, remain void notwithstanding the subsequent abolition of slavery by the Constitution of 1865. No validity has been imparted to them by this Constitution, or by any Ordinance of the Convention or Act of the Legislature.

[9.] The whole will having been set up in the Court below, in consequence of an erroneous charge to the jury, when, according to the evidence and the law applicable thereto, an intestacy should have been declared as to a certain definite amount of the estate, and no more, the Supreme Court, in the exercise of the ample discretionary powers conferred by statute, instead of ordering a new trial, gave specific directions for disposing finally of the litigation by a proper judgment.

Caveat to Will. Motion by Caveators for New Trial. Decided by Judge A. REESE. April Adjourned Term, Warren Superior Court, 1866.

Pierce Bailey made his will in September, 1861, and died in September, 1863. The will was proved in common form in October 1863, and being afterwards offered for probate in solemn form was caveated by plaintiffs in error, on the ground that it was in conflict with the anti-manumission laws of Georgia, and therefore void. The will being sustained by the Ordinary in January, 1863, the caveators

appealed to the Superior Court. On the trial propounder offered in evidence the following testimony, viz: The depositions of John S. Taylor, D. W. McJunkin, and Edwin Andrews, subscribing witnesses to the paper propounded as the last will of Pierce Bailey. Said witnesses proved the due execution of the same, and capacity of said Bailey to make a testamentary disposition of his property.

Next, the following paper:

In the name of God, Amen.

I, Pierce Bailey, of the State of Georgia, and county of Warren, being of sound mind and disposing memory, do make, declare and publish this my last will and testament touching such property as I may die possessed of, hereby revoking, disannulling and declaring null and void all other wills heretofore made by me.

Item 1st. I wish all my just debts and funeral expenses paid out of such moneys as may be in hand at my death.

Item 2d. After paying my debts and funeral expenses, all the rest and residue of my property, both real and personal, lands, negroes, plantation tools, hogs, horses, mules, and stock of all kinds and descriptions, produce, crops, and money, notes, bonds, specialties, accounts, dues of all kinds, all evidences of debt belonging to me at the time of my death, I will and bequeath unto my beloved nephew, Lawrence Battle, to be his absolutely.

Item 3d. As the following named negroes, to-wit: my house servant Adeline and her child Tolbert have been good, trusty, and faithful servants to me, it is my wish and desire that the said Adeline shall not be separated from her child Tolbert, and it is my wish and desire that my said nephew Lawrence Battle, to whom I give them, shall treat them kindly, and see that they are as comfortably provided for as their condition in life and their conduct and behavior will justify. I wish him to treat them just as he may at all times think I would treat them if I were in life; this confidence I repose in him with the full assurance that it is not misplaced, and that it will not be abused.

Item 4th.  I nominate, appoint, and constitute my said
nephew, Lawrence Battle, executor of this my last will
and testament.  In testimony whereof, I have hereunto
set my hand and seal, this the 7th day of September, 1861.
                              PIERCE BAILEY, [L. s.]
Signed, sealed, etc., in the presence of
          D. W. McJUNKIN,
          E. R. ANDREWS,
          JOHN S. TAYLOR.

Counsel for the propounder then closed, and the follow-
ing evidence was offered on the part of the caveators:

Depositions of *George S. Allen*—I live in Warren county;
am 65 years old.  I have known Pierce Bailey ever since I
knew any one.  I was on terms of friendship with him.  He
often consulted me upon his affairs, and I have frequently
been to his house.

Pierce Bailey had no brother, and but one sister living at
the time of his death.  She lived on one of his plantations
about one mile and a half from him.  In 1853 I was at Bai-
ley's house, and he was quite sick, thinking he was going
to die.  Bailey stated to witness, that he wanted Jones and
wife to have all his lands and negroes, and asked witness to
reduce it to writing.  He further stated, that he wanted his
sisters, Mrs. Polly Battle and Mrs. Milly Smith, and their
children, to have all his stock of all kinds, and his present
crop to be divided among the above named sisters and chil-
dren.  At that time, he manifested no dislike to Jones, to
his wife, nor to Polly Battle.  Bailey told witness in Decem-
ber, 1861, that he had made a will; that he sent for Frank
Bristow to come to his (Bailey's) house; that he then gave
him instructions as to drafting it; that he had given every-
thing he had to Lawrence Battle.  Bailey said he told Bris-
tow he designed setting Adeline and child free, and also
giving them twenty thousand dollars, and that he requested
Lawrence Battle to give the child a good education.  Bris-
tow told him that would not do, because it would break his

will and set it aside.   Bristow further told Bailey, as he said, that he would have to trust some one outside of the will with that matter.   Bailey stated that he had more confidence in Lawrence Battle than any one else, and that Lawrence had promised to carry out his designs; that the child was his (Bailey's) and he did not care who in the hell knew it. Lawrence had promised to carry out his designs by letting Adeline and his boy do as they pleased, and giving his boy a good education, and giving them twenty thousand dollars, and for that reason he had given the balance of his property to him.   Witness remarked to Bailey, that he (witness) thought it doubtful about Lawrence doing it.   Bailey said Lawrence had promised him to carry out his designs, and if he did not do it, he was a damned rascal.   I have already given in substance what passed between Bailey and myself about making his will, and what his object and purpose was. There was no one present at the conversation between witness and Bailey; do not know of any one having similar conversations.   Bailey thought a great deal of Adeline and child; said he was the father of Adeline's child.

*Cross-examined.*—The conversation was some months after the execution of the will.   Testator was of strong will, and sound and disposing mind and memory up to the time he was killed.

*Curren Battle*, sworn for caveators—Knew Pierce Bailey well; had known him for many years, and was intimate with him.   In 1863, testator come to witness's house to get some money which witness owed him; wanted one thousand dollars.   Witness told him he would make arrangements to get it for him; this was six or eight weeks before he died.   Witness asked Bailey what arrangements he had made for Adeline and child in his will; asked him this as he had often heard him speak of intending to make some arrangements for her.   Bailey said he had, but it had cost him all of his property to get Lawrence Battle to do it; had given them twenty thousand dollars, and directed that a little negro, name not recollected, to wait on Talbot.   Lawrence had promised to

carry it out; that Frank Bristow had written his will; said other things about the matter, but does not now remember what they were.

*Cross-examined*—Was not on friendly terms with Lawrence Battle; had not been very busy in hunting up evidence for caveators, but had gone with Mr. Pottle to see some witnesses; was asked by him to go and shew him the way; had conversed with other persons when Mr. Battle was not with him; had conferred with Frank Holden who had told him of some persons who would testify against the will; Bailey did not get the money he went after; there was no arrangement with caveators that the debt should be released to him in case the will was set aside; don't know that Frank Holden was authorized to offer ten thousand dollars for testimony to break the will.

Caveators then read the depositions of Joseph L. Amsden.

*Joseph L. Amsden*—I have known Pierce Bailey for thirty-seven years; I have been at his house more or less nearly every year. Bailey never said anything to me specially as to what disposition he expected to make of his property. I have heard Pierce Bailey say frequently that he would be glad to free Adeline, but the laws of the State would not permit, and if he could fix it he intended to give her at least twenty thousand dollars, besides several young negroes that he intended for Adeline; never heard him say that he had given any one directions about her, nor never heard him say anything about leaving money to any one for her benefit; heard said Bailey say that he had made over his property to Lawrence Battle because he was under prosecution under the charge of having killed a negro. I understood him to convey the idea that the instrument was temporary; as he made his property over to another in a former and similar case for the same purpose; don't recollect the time, but the place was at his house. Lawrence Battle stated to me in Augusta, soon after the death of Pierce Bailey, that there had been no other instrument executed and left by Bailey but the instrument referred to in the third answer, but said Battle claimed that this was

Bailey's will, and that the property was all left to him. Battle stated that he had instructions about Adeline from his uncle, which he was bound to carry out, but don't recollect as he stated the nature of the instructions. Battle said he had Adeline at his house then, and had put her in possession of the keys, and that his (Battle's) sister did not like it.

*Cross examination.*—My impression is that Lawrence Battle attended to his uncle's business, and, I presume, enjoyed his confidence. Never heard Bailey say that he intended to give Battle his property. I don't know that Bailey was more intimate with Lawrence Battle than other of his relatives. I have heard Bailey speak in praise of Battle's shrewdness, and said he would take care of what he had or what he got. Never heard him say he intended to leave his property to Battle. Bailey never said anything to me about his will. Bailey spoke to me about an instrument or paper executed by him, but did not state by whom it was written, or by whom witnessed, nor the time or place where it was executed. Bailey did not call it a will, but simply said he had made over his property to Lawrence Battle, and that the instrument was temporary, as I understood it. I am of the impression that Battle expressed confidence in Adeline's honesty.

*George F. Bristow*—I wrote Pierce Bailey's will in the the summer of 1861, at Crawfordville. The will was written on Thursday or Friday, and was signed on the following Saturday. Pierce Bailey sent for me to go to his house to write his will. Soon after I arrived there he invited me into his room, and said he wanted me to write his will; that if it could be done he wanted to manumit his house servant Adeline and her child Talbot, that he wanted a negro girl, whose name I have forgotten, but who, I inferred, had been nurse for Talbot, to remain or stay with Adeline; that he wanted twenty thousand dollars set apart for the use of Adeline and Talbot; they to have the interest of the said sum, or so much thereof as might be necessary for their support and maintenance, and for the education of Talbot, whom he wished educated; and at the death of Adeline he wished the twenty

thousand dollars and the unexpended interest thereof to go to Talbot. All the balance of his property, of every kind and description, he wished to give to his nephew, Lawrence Battle. I told him that he could not emancipate the slaves, and that I knew of no way by which he could secure to them the $20,000; that if he willed it to them it would belong to those to whom he gave the negroes; besides, by willing them so large an amount it might be considered an attempt to manumit them, and that an attempt might be made to set aside that part or clause of his will. He replied that he wanted his will to stand, that he did not want anything put in it that would tend to break it. He seemed very anxious about the welfare of Adeline and Talbot, and said, "I'll be damned if I had not rather see my whole estate sunk than to fail to carry out my wishes concerning them," or words to that effect. He then asked if he could not direct in his will for them to be carried and settled in another State. I told him that I thought he could not, that an Act of our Legislature, I thought, declared all such clauses void, but that he could settle them in another State before he died. He did not say whether or not he would remove them. He then said if this provision could not be made for Adeline and Talbot, he would give his entire estate, including Adeline and Talbot, to Lawrence Battle; and so directed me to write his will. I then drew a rough draft, according to his instructions, and told him that I would carry it home with me, and examine the statute relative to the manumission of slaves by will, and if I could see any way by which his wishes concerning Adeline and Talbot could be carried out, I would so write; if not, I would draw it according to the draft I had already drawn. To this he assented. Bailey never said anything at all concerning what Battle, the propounder, would do, or would be requested to do. I don't think he mentioned the propounder, except as his legatee and executor. I think I have stated all the conversation about the will. A short time previous to making his will Pierce Bailey had shot and killed one of his negroes,

for which he was afterwards indicted. I don't think Lawrence Battle said anything to me about how Pierce Bailey was going to make his will. I am certain he did not. I know nothing more of benefit to defendant. No one was present at any interview between us, when the matter of making his will was mentioned. I am not of counsel in this case, and have no interest in the event of this suit.

*Cross-examination*—I think it was on Wednesday that I met Bailey in consultation about his will at his house, and on the following Saturday I met him by agreement at Barnett. I told him that when I examined the statute, I found it just as I had given him my opinion it was when I was with him at his house; that he could do nothing for Adeline and Talbot by will. He then asked me if I had the will written. I told him that I had. I then read it over carefully to him, and asked him if it was as he wished it; he said it was; and he called in the witnesses and signed it. We retired into the back room of Lawrence Battle's Grocery There was no one present but ourselves when I told him the result of my investigations, and read the will over carefully. After expressing himself satisfied with it, Bailey signed the will in the presence of the witnesses, telling them that the paper was his will, that he wanted them to see him sign it, and for them to sign it as witnesses. This was the only will I ever wrote for Pierce Bailey. After telling me that he wished to give all his property to Lawrence Battle, he asked if he would not have to give all his other relatives five dollars apiece, or some other sum, to prevent them breaking his will. I told him that he would not. That he need not give them anything unless he wished to do so. He replied that unless he was obliged to give them something in order to prevent their breaking his will, he would not give them a durned cent. This was all he said about any of his relatives. I don't think that during our interviews he called the name of any of his relatives except Lawrence Battle.

Caveators then read additional depositions of *George F. Bristow, Esq.*—I did not tell Bailey that his wishes as to

emancipation could be carried out in any other way than by sending them out of the State of Georgia before his death; on the contrary, I told him it could not be done in any other way. I did not tell him that his wishes could be effected by an understanding with any trusty friend, nor did I name such friend. In the course of the conversation, I stated that some persons having negroes they wished to provide specially for, as he did, left them to some friend, with a private understanding between them; but that such was unsafe and uncertain, and the only way he could legally effect his wishes, was to send them away in his life-time, and I named Maryland and Kentucky as States to which he could carry, manumit, and settle them before he died. I also told him, that I was of opinion that the laws of Ohio did not prohibit the introduction of free negroes into that State, and that he might settle them there. Upon this subject we talked some time. I cannot recollect all that was said by him or me, but the above is the substance of all that was said by either of us. Bailey simply asked questions, and I answered them in substance as above stated.

*To the 2d*—What was said by me to Mr. Bailey, as stated in the foregoing answer, was said after I had drawn the rough draft of his will, leaving all of his property—Adeline and child included—to Lawrence Battle. I did not then consider it advice, nor do I now. I had drawn his will according to my opinion of the law under his directions.

*First cross*—Adeline and child were to be slaves—I don't think he mentioned Battle's name except as his legatee and his executor; this all occurred at the time referred to in the direct interrogatory, and in the same conversation. Mr. Bailey had no interview with Lawrence Battle from the time he first mentioned the subject of his will to me, until he had completed his directions to me about writing it, and I had drawn the rough draft before mentioned. We were all the time alone together, and after it was written and read to Mr. Bailey, he had no interview with Lawrence Battle until it was executed. I did not tell Lawrence Battle or any other

person the contents of the will, and I know Mr. Bailey did not, from the time I first read it as it was drawn to him until after it was executed, for we were all the time alone together, from the time I read it to him until the witnesses came in, and it was then immediately executed. Lawrence Battle was not present.

*Thomas Jones*—Knew Bailey and Jones and wife; had a conversation with Bailey soon after 1853; Bailey said he intended to give his property to Artamesia (Jones' wife,) and Polly Battle; Jones attended the trial of Bailey; was friendly with Bailey; Jones was brought there as a witness. After the trial, Jones and Smith came back, and he heard Bailey say if he had no negroes, they would not be coming to see him; that they wouldn't get anything.

Counsel for caveators then closed, and the counsel for propounder offered the following testimony in rebuttal:

*James Battle*—Is the brother of executor, and nephew of Pierce Bailey; had lived on the plantation of Pierce Bailey; knows that Bailey was not on friendly terms with George S. Allen; had heard Bailey speak of him; had no confidence in him; had seen Allen at Bailey's house; ever since the Cooper case Bailey did not like him; can not give an instance where Bailey treated him disrespectfully in late years; never knew him to invite Allen to eat dinner with him, but never knew Allen to be there at meal time; witness worked on the plantation, but Bailey would always tell him when any one went there; he would meet him in the field, which he did every day when at home.

Adeline staid about the house and superintended the milking, weaving, etc.; had known him to whip her, and the other negroes also; not her as much as some of the rest; believe that he did claim Talbot as his child; Cobb's wife is his (Bailey's) niece, and so is Jones's wife; Polley Battle was Bailey's sister, and mother to witness; she has three children, one daughter and two sons. His mother lived on Bailey's land, and is poor; never knew Bailey to have any dislike to his mother; they were very friendly. Bailey's estate before

freedom was worth 150 or $200,000. Talbot is about six or eight years old; has made no arrangements with Lawrence Battle about the property in case he should succeed. Lawrence Battle has not promised to give him any thing; knew that Bailey had no confidence in Allen from the manner in which he talked about him; thinks if Allen had been there in December, 1861, he would have known it; he might have been there and witness not known it; did not see him there; Lawrence Battle went after Bristow to write Bailey's will.

Counsel for caveators objected to that portion of James Battle's testimony as to the sayings of Bailey as to the state of feeling between himself and Allen. The Court overruled the objection and admitted the testimony; to which counsel for caveators excepted.

*M. L. Pittman*—Has known Pierce Bailey a long time; was intimate with Bailey; was with him nearly every Sunday, up to the time of his death; about a year before he died, was present when Bailey let Lawrence Battle have twelve hundred dollars, or some such sum, to buy a negro; told him to take the deed in his own name, that all belonged to him, Lawrence, anyhow; might sell his negroes after the war and put the money in stocks; witness said, Counsellor you may change it; Bailey said no change, no alter. Lawrence was not present during this conversation about the will.

*John Heath*—He and Dortch Newsom, his son-in-law, borrowed some money from Bailey about 1859, and G. S. Allen stood their security; afterwards Newsom left for Alabama, and Allen got Bailey to sue the notes and arrest Newsom on bail; witness went to see Bailey about it, and Bailey said Allen was trickey and would not do to trust.

Counsel for caveators objected to the sayings of Bailey as testified to by the witness. The Court overruled the objection, and counsel excepted.

*M. H. Hubert*—Doesn't think that Bailey was friendly with G. S. Allen; had been to Bailey's house with Allen; borrowed money from Bailey, and Allen stood his security;

this was in 1861; gave the notes to Lawrence Battle; since Bailey's death, Allen had ordered the notes sued; heard Bailey say in 1859, at his house, that he wanted witness to write will; that he wanted to free Adeline, and give her twenty or thirty thousand dollars; witness would not write it; said he was no lawyer; knows that Bailey had no confidence in Allen; did not tell Lawrence Battle that if he would court Adeline he would get Bailey's property, but did tell him that he thought Bailey would give him his property; Lawrence transacted his business.

*Sterling Ivey*—In 1863, a short time before Bailey's death, he went to pay Bailey some money; this was not long before Bailey was killed; Bailey said he had made his will, and given his property to Lawrence Battle; asked him why he didn't give it out amongst his kin? Bailey said, you have children, and don't you want your property to go the way you want it? Witness had been very intimate with Bailey, and had often joked Bailey about giving his children some of his property. The conversation arose by witness speaking of this, and Bailey said he had already given his property to Lawrence Battle.

Propounders then closed, and counsel for caveators introduced V. A. Johnson, Thomas J. Pilcher, William H. Pilcher, and Lewis Jones, who testified, substantially, that they had known George S. Allen for many years; his character was as good as any man's in the county, and they would believe him on his oath in a court of justice; would weigh his testimony like any other person's.[*]

The jury returned a verdict for the propounder; whereupon counsel for the caveator moved for a new trial, on the following grounds:

1. Because the Court erred in permitting propounder to give in evidence the sayings of Pierce Bailey as to the state of feeling existing between himself and George S. Allen, and as to the estimation in which the latter was held by the former:

---

[*] The charge of the Court, so far as the same is material, will be found in the motion for a new trial.

2. Because the Court charged the jury that the declarations of Bailey, before or after making the will, cannot prove or establish any trust, secret or otherwise, in this case, unless it be shown that Battle became a party to such trust by other evidence than the sayings of Bailey; that it was not competent to prove that fact by his sayings, and you will not consider them for that purpose.

3. Because the Court erred in charging the jury that it was necessary that the proof should show the terms of the agreement or trust, so that we may determine whether it is in contravention of the statute or not.

4. Because the Court erred in charging the jury that a secret trust for manumission, embracing property and slaves, to affect the will, must have been created or raised before, or at the time when the will was made; must have been part of the will, and to be executed with it. An illegal arrangement, a trust subsequently entered into after the will was made, and independent of it, between Battle and Bailey, if any such were made, cannot affect the will. That to constitute a secret trust in devisees of lands or legatees of slaves, there must have been some contract, agreement, or stipulation, written or parol, between them and the testator. That the mere expectation or hope of a testator, that his legatee would dispose of the property given, in a manner not set forth in the will, creates no trust in the legatee. That the intention of the legatees as to the disposition they will make of their interest in the estate, cannot affect the construction of the will. That it is competent for a testator, in bequeathing a slave, to make express provision for the kind treatment of such slave, and that such requests or provisions do not amount to manumission, nor are they vitiated by a gift of other property therewith, and that a parol request for such kind treatment made prior to, simultaneously with, or after the execution of the will, cannot invalidate it. That the words of the will do not, of themselves, establish or constitute any trust inconsistent with the condition of Adeline and Talbot as slaves, nor do they conflict with any law

of this State of force at this time, or at the time of the death of testator, upon the subject of the manumission of slaves. That there are no words in the will propounded, to prevent its going to record consistently with the laws of this State of force, or of force at the death of the testator, on the subject of the manumission of slaves.

5. Because the Court refused to give the following charges, as requested in writing, to-wit: Though the jury should believe that there is nothing in the will in contravention of the laws of the State against manumission, yet if there is enough outside, which is proven, going to show that the testator attempted to violate said laws, the whole may be taken as one scheme, and the will is void. But changed and modified said charge, and gave it as follows, to-wit: Though the jury should believe that there is nothing in the will in contravention of the laws of the State against manumission, yet if there is enough outside connected with the execution of the will, which is proven, going to show that the testator (Battle agreeing and concurring therein) attempted to violate said laws, the whole may be taken as one scheme, and the will is void, *provided*, you shall believe that the legacy to Battle was the consideration agreed upon by him and Bailey for his undertaking, and no other motive induced the legacy.

6. Because the verdict rendered in the case is contrary to law and evidence.

7. Because the said verdict is contrary to the evidence, and strongly against the weight of evidence.

In the answer of the propounder to the rule *Nisi*, for a new trial, it was insisted that a new trial ought not to be granted, because:

1. The laws of this State, under which the *caveat* in this case was filed, were entirely penal in their character, founded upon the impolicy of the manumission of slaves in the State. All these laws and these penalties became obsolete with slavery, and have now no force or effect.

2. If they are of force, the law as set forth in the Code is the

law governing the present case, being the law of force at the death of the testator.

The motion for a new trial being overruled, counsel for caveators excepted.

DOUGHERTY and POTTLE, for plaintiffs in error.

A. H. STEPHENS and BARNETT & BLECKLEY, for defendant.

HARRIS, J.

Had not the Legislature invested this Court with ample power to mould the judgments of the Superior Courts, when brought here for review, as in its discretion should be consistent with law and justice, this case would have been sent back for a new trial, as we can not concur in the verdict, that Pierce Bailey died testate as to all of his property; nor can we acquiesce in some of the rulings of the presiding Judge.

[1.] A moment's reflection will show that our difference in opinion springs from the question of the admissibility of the sayings of the testator, (Bailey) to affect or characterize his own acts in the disposition of his own property, and whilst it was under his own control.

We do not intend to argue the matter; but adhereing to the principles upon which the decisions made in reference to our laws against the manumission of slaves have hitherto been placed, we think they were clearly admissible to show his intentions, purposes, and acts,—the inquiry being, under our statutes, whether the *testator* did attempt in any mode or by any plan or device to defeat the policy of those statutes.

It has been the uniform interpretation of this Court, of the statutes relative to emancipation, that any act or contract of a testator for the purpose of evading these acts, is, of itself, enough to make so much of it void as is illegal; and so of his

will: the same rule is applied, also, to parol gifts or trusts for such purpose.

The declarations of the party, whenever made, have been held sufficient to prove the intention. The case in 6 *Ga. R.*, as will be seen by reference to it, went so far ·as to allow the *opinions* of the executors of King to go to the jury as evidence of King's intentions, though they were based on no knowledge of, or declaration of intentions by King to them. *A fortiori*, would not King's sayings as to his intentions have been better evidence?

From what has been said, it must be aparent that we can not assent to the following charges of the presiding Judge in this case, viz:—

"That the declarations of Bailey before or after the making of the will, can not prove or establish any trust, secret or otherwise, unless it be shown that Battle became a party to said trust by other evidence than the sayings of Bailey; that it is not competent to prove that fact by his sayings, and that you will not consider them for that purpose; that it is necessary that the proof should show the terms of the trust or agreement, so that we may determine whether it was in contravention of the statute, or not; and that to constitute a secret trust in devisees of land or legatees of slaves, there must have .been some contract or agreement or stipulation, written or parol, between them."

[2] Narrowed down, as we have sought, to such matters as require notice, the mind is first directed to the will itself, to see if upon its face there is anything in contravention of our anti-manumission laws, and to what extent. Apart from the testimony, and examined without its light, its cautious and cunning phraseology is well calculated to delude, and to hurry us to the conclusion, that beneath the surface there is nothing objectionable. Viewed in the light of the testimony, article 3d stands out from the canvass with such marked features that they will be readily recognized.

The testator, an old bachelor, under prosecution for killing a negro in 1861, sends his nephew Lawrence to get Mr.

Bristow, an attorney, to come down and draw his will, and then discloses to his attorney his wish to manumit his house servant Adeline and her child Talbot, to leave with her a negro, and to set apart $20,000 for their use,—they to have the interest on the said sum, or so much as might be necessary for their support and maintenance, and for the education of Talbot, and at the death of Adeline the whole to go to Talbot.   Talbot is the acknowledged child of Bailey, and is six· to eight years old.

Bailey had been heard to say, frequently, he would be glad to free Adeline if he could fix it, and give her $20,000.

Bailey's wishes are thus, by his own saying before the making of his will, very clearly disclosed.

He is advised legally, that by will he cannot make such provision for them as he desired ; that if they were embodied in a will, such part or clause would be set aside.

Anxious that his will should stand, " he wanted nothing put into it that would tend to break it."   Finding that such provision as he wished for Adeline and Talbot could not be made in the will, he then directed his will to be drawn, giving all his estate, including Adeline and Talbot, to Lawrence Battle.   This was in the summer of 1861.

In December, 1861, Bailey said, Lawrence Battle had promised to carry out his designs, by letting Adeline and her boy do as they pleased, and giving his boy a good education, and giving them $20,000.

In 1863, a short time before his death, he said to another witness, that Lawrence had promised to carry out his wishes.

Since the execution of his will, we have the statement of Bailey, that having been informed that his intentions as to Adeline and Talbot could not be embodied in his will, he would have to trust some one *outside* of his will with his purposes, and having more confidence in Lawrence Battle than any one else, he had obtained his promise to carry out his designs.

Let us now subject article 3 to a clear examination.   " As my house servant Adeline and her child Talbot have been

*good, trusty,* and *faithful* servants to me, it is my wish and desire"—the qualties given to these slaves are always appreciated, and deserve recognition as proper motives to indulgence; but how can they be applied with *truth* to a boy of six years of age? The ascription of such traits as trusty and faithful, is not simply false: they were used here to conceal the true motives of testator. Those motives are found in the fact that Adeline was his mistress, and Talbot was his child.

"It is my wish and desire that Adeline shall not be separated from her child Talbot." In this there is a restriction of the right of the person to whom they were given, as owner, and is a circumstance indicative of design in testator to make Lawrence Battle only nominally master.

"It is my wish that my said nephew, to whom I give them, shall treat them kindly, and see that they are as comfortably provided for as their conditions in life, and their conduct and behavior, will justify."

This clause seems unexceptionable, and, by itself, would seem to be an injunction of mere humanity and of law; but why was not the same duty imposed as to all his other slaves—why discriminate in favor of these two? The reason has been given.

The solicitude of the testator for these slaves does not stop here. The executor is further enjoined "*to treat them just as he* (the exector) *may at all times think the testator would treat them if in life.*" The executor lived in the house of Bailey—had lived with him for years; he must have seen the intimacy which existed between Bailey and Adeline; he must have known, what so many others knew, that Talbot was his child. With full knowledge of these relations and the invariable relaxation of dominion that attends such connections, this executor, a man of business habits and intelligence, and having the entire confidence of testator, who had given him the bulk of his large estate, could understand the language last quoted from the will but in one way. Interpreted by the testimony, it amounts substantially to this:

"I have given to you Adeline and Talbot nominally as slaves, but they are to be treated by you as if really free; I have given you $20,000, in trust for them; they are to be main-tained out of its annual income, $1,400, without being put to any labor, or you to any expense in their behalf; their future is to be as uncontrolled as it has been; I raised Adeline to an equality with me; she became my mistress, shared my bed, is the mother of my child; she has my entire confidence, rules and orders my house, and bears the insignia of the wife in her girdle; they have my love, and demand my care for them in the future; I rely upon your promise to execute my purposes in reference to them; you must treat them *just* as, from your knowledge of all these things, you, at all times, must think I would, were I in life.    This confidence I repose in you, because you are my nephew to whom I have given everything except the provision in your hands for them, and of your promise to me to carry out my intentions—these give me full assurance that my confidence in your honor and gratitude is not misplaced, and that you will not disappoint my expectations."

Can any one fail now to perceive a meaning in the 3d article, which, without the testimony, was dim and indistinct?

[3.] *Anguis latet in herbam.*    We might safely say that a trust is covered up in this third article; but the case does not require us so to decide.    Bailey's statements sufficiently established a parol trust, as to placing Adeline and Talbot in a condition at variance with then existing laws, and setting apart $20,000 of his property as a provision for them. That trust is void; and there is, therefore, an intestacy as to the sum of $20,000.

Whilst writing out this opinion, it has been suggested that the caveators did not, below, argue the illegality of the trust as to $20,000 for Adeline and child.    This may have been so; but we confess we cannot well comprehend any argument against the entire will, " as one scheme," that does not lay its foundation in the attempt of testator to place Adeline and child in a condition unauthorized by law, and making

this provision for them. They sought to affect the entire will, by insisting that the legacy to Lawrence Battle was solely the fruit of an illegal consideration—his promise to give effect to Baileys's purposes concerning Adeline and child. To support this line of argument, they were logically compelled to maintain the existence of such parol trust; and whilst it did not cover their whole ground, it was, of necessity, included.

The caveators took the ground, "that though the will should be unobjectionable on its face, and seemingly consistent with law, if, in the progress of the trial, facts enough are proved going to show that the testator attempted to violate the laws against the manumission of slaves, the whole will must be taken as one scheme, and is, therefore, wholly void." We cannot assent to this position as law. The correct rule is, *only so much of the will is void as is clearly involved in* the attempted violation of the laws against manumission. It can not be regarded as one scheme, in the sense of our legislation, unless it has that unity in purpose, so as to make all its dispositions connect themselves with a manumission project, or, are made to aid it or depend upon it.

If, however, the idea was, that the entire will was void because the legacy given to Lawrence Battle was upon the sole consideration of his having promised to carry out Bailey's scheme as to Adeline and child, that is distinct and tangible; and if the whole testimony, considered together, was conclusive in establishing that to have been the sole controlling motive for the legacy, it would bring up the important question, whether a legacy given solely upon the consideration of a promise to do an act merely *malum prohibitum*, was void or not.

Caveators, to prove that it did constitute the sole consideration for the legacy, rely on the testimony of Allen and Curren Battle. The first makes Bailey say, "that, for the reason that Lawrence had promised to carry out his designs

by letting Adeline and his boy do as they pleased, and giving his boy a good education, and giving them $20,000, he had given the balance of his property to him." The last represents Bailey as saying, in 1863, a short time before his death, that he had made arrangements for Adeline and child; but that it had cost him all of his property to get Lawrence Battle to do it.

[5] Whilst Allen makes Bailey to state as above, the motive which induced the legacy to his nephew, it can not escape observation that afterwards, in answer to an interrogatory, as appears by the bill of exceptions, he says "he has given, in *substance*, what passed between Bailey and himself about making his will, and what his object and purpose was." From this we can draw no other conclusion than that he does not pretend to give the words of Bailey, but simply to express the substance, *as he understood it.*

Curren Battle makes Bailey say, it had cost him all of his property, etc., but adds that Bailey said *other things about the matter*, but does not now remember what they were. Here, instead of giving all the conversation of Bailey touching Adeline and her child, what Lawrence Battle promised, what exacted, when it happened, etc., they are omitted, and the "other things about the matter" are not remembered. Can much value be given to the testimony of a witness whose memory is so faulty? In estimating it and in getting at exact truth, who does not see the importance of *all* that Bailey said about the matter, in this conversation, being fully stated? How often, in human affairs, has it occurred, that the change or omission of a word, the substitution of the definite for the indefinite article, has given a meaning to what is represented as having been said, widely different from what was actually said? How often, also, has it happened, that the recital of a part of a conversation, the picking out, as it were, of a sentence, separating it from its context, has distorted the whole idea and given to it a coloring that is false?

Is it not utterly unsafe to act, in affairs of moment, upon

testimony liable to such palpable objections? This witness stands in an attitude, moreover, which can not but affect his credibility: he was not on friendly terms with the legatee; he had, also, been active in getting up evidence for the caveators; he had accompanied counsel to see witnesses, and had shown a partizanship which makes his testimony obnoxious to severe and just criticism.

In reference to Allen, it should also be borne in mind that it was shown that Bailey had no confidence in him; and, consequently, the inference was legitimate, from the fact that Bailey would not unbosom his heart freely to such a man.

[6] The testimony as to how Bailey regarded Allen, was resisted by caveators; and its admission below has been made a ground of alleged error. We see no proper ground for its exclusion: it did not fall within that of impeaching a witness which goes to the utter discrediting him. It sought to show the relations between testator and witness, that the jury might consider the value of his testimony, according to them. Evidence of friendship, or hostility, or relationship, of confidence or distrust, seems to us to be clearly admissible: without their being shown, a frequent result would be that juries would be compelled to give full credit to a witness whom the opposite side was unable to impeach by showing that he was unworthy of being believed at all,—a task always of delicacy and difficulty.

[7] Subject to the disparagements which we have mentioned, as is the testimony of these witnesses, their convincing force, their probative quality, is almost entirely destroyed by the *improbability* of the promise of Lawrence Battle being the sole motive for the legacy.

We can not, as it is so contrary to any knowledge we have of the conduct of men generally, realize the idea urged by caveators, upon the testimony of Curren Battle, that Pierce Bailey was under the necessity of giving to his nephew near $150,000 of property, to get him to act as nominal owner of Adeline and child and to hold in his hands $20,000 for their use; or, in other words, he was bribed, by this very large

legacy, to do an illegal act.  The performance of what Bailey desired could have subjected his nephew only to the payment of a penalty of $1000, upon conviction, but to no punishment.  It would have been a mere violation of municipal policy: it would not have been an act *malum in se*, and therefore without moral guilt.  Thus considered, is it not calculated to excite such a degree of astonishment as to produce incredulity, to be told that a man who had for years been an inmate of his uncle's house, known the intimacy of the master and the slave, and who had nosed daily the filthy sty, should suddenly start up and exact from that uncle all the balance of his property, before he would give his consent to carry out his uncle's wishes?  The thing has so little semblance of probability on its face that we can not give it entertainment.  The other sayings of Bailey, running through four years, are to be considered in connection with these; and from the whole are we to extract the truth.

We are told by a witness of caveators, that he had heard Bailey say he had made over his property to Lawrence because he was under prosecution, or about to be prosecuted, for killing a negro.  The instrument referred to was evidently this will.  Surely, if Bailey made this will from that motive, the legacy could not have been given for the reason insisted on.  Ignorant men pressed by pecuniary embarrassment, security-ships, and criminal prosecutions, resort to plans of this kind to avert present or anticipated trouble.  If this will was made from such motives, we are impressed with the conviction, that Bailey's heirs at law would find it difficult, on that ground, to prevent the will from going to probate.

The fact mentioned by this witness has its importance in the ascertainment of Bailey's intention; though, we are not inclined to let the dispositions of the will rest upon it alone.  The intentions and motives of Bailey in making this will are to be collected from all the facts in the case.  Bailey's attachment to his kindred, in general, appears to have been weak.  His only sister, the mother of executor, with a daughter and

61

younger son, were living on his land, and, to some extent, objects of his care. For caveators he had no affection whatever: he suspected the sincerity of the attentions of some of them, as far back as the ·year 1853, saying, they would not have visited hin but they knew he had negroes. Again, to Mr. Bristow, the attorney who drafted the will, that he would not give to any of the rest of ·his kin, except Lawrence, "a durned cent," unless to prevent his will being broken. At no time, for years, is there any evidence that any of his kindred, except Lawrence, had any hold on his regard.

For Lawrence, however, his favorite nephew, near in blood, (none nearer except Lawrence's mother) he had strong partialities; he had lived with him; had attended to his business; was careful and thrifty, and would take care of what he had, and what he got; and to an old money-lender, and avaricious, like Bailey, and whose sole ambition was accumulation, what legatee so likely to suit such a man, as was his nephew, Lawrence, to whom he was accustomed. Affection is most always the result of such intercourse, and to an old man a necessity.

Bailey's sayings before the making of his will, to Hubert and Bristow, show his purpose to make Lawrence his legatee; to Ivey, afterwards, *that he had given his property as he wanted it to go*, and evincing most clearly his fixed design: the fact, testified to by Pittman, of Bailey advancing $1,200 to Lawrence to buy a negro, and directing him to take the deed in his, Lawrence's, name, as *all belonged to him*.

Sifting the whole record, closely observing the character of Bailey as developed by it, and analyzing the testimony as best we could, visible, and heard only on paper, and therefore rendering it impossible for us to estimate the credibility of the witnesses with accuracy, we have arrived at the conclusion that the testator was influenced by mixed motives, partly legal and partly illegal, in the making of his will—illeegal only as relates to the position in which he sought to place Adeline and Talbot, and the provision for them, outside of the will, of $20,000 in the hands of Lawrence Battle.

. [8.] It was argued with earnestness and plausibility, on the part of the propounders of the will, that, conceding that it was the design of Bailey, at the time of making his will, to emancipate Adeline and child, still, as slavery had passed away in Georgia, contracts, deeds, and wills in favor of slaves, once void under State policy as endeavoring to effect emancipation, have, in consequence of the present status of the negro, been divested of the illegality which had attached to them ; and that if this was true, it was the duty of the Courts to give effect to all such instruments.

We cannot assent to this as either a just or legal principle. If the principle was correct, looking to the consequences which would ensue from its recognition, we would give much further consideration to it than we have, and explore it in all its bearings, before according it our sanction. We refrain from specifying them. *Incedimus per ignes suppositos cineri doloso*; it is enough dimly to indicate the direction in which lie innumerable perils.

Whilst it is true that the recognition by the convention of Georgia, in November, 1865, of the abolition of slavery, *thenceforth* swept away, at a blow, all laws in reference to negroes as slaves, their freedom began then : it did not, by that alteration of the State Constitution, acquire any relation back. If this is so, it is unquestionable that, at the death of Bailey, these slaves had no legal capacity to take or receive property by devise or otherwise: they can not, therefore, by their change of status, be entitled to the benefit of the parol trust of $20,000, made in their behalf. We dismiss this branch of the argument, with the simple expression of our opinion, that if any portion of the will of Bailey was made in violation of the laws of force at the time, or any parol trust or agreement in contravention of those laws, no act of the Convention, or of the Legislature since, has made valid any will, devise, deed, or other instrument or trust, which was before void.

[9] Having thus presented the view we entertain of this case, it is proper that we assign distinctly the reason which

influenced us not to award a new trial.  This opinion shows that we differ essentially with many of the rulings of the presiding Judge.  We do not doubt but that if the sayings of Bailey had been permitted to go to the jury, with full liberty to consider and act on them, that the verdict would have been different: they possibly might have set aside the whole will as illegal.  Had this occurred, we would have felt bound to have granted a new trial; as such a verdict would not have accorded with the truth and justice of the case.  The caveators could then have gained nothing by a new trial: they gain, however, by our judgment here, all that we think they are entitled to; and the propounder loses an advantage which we can not allow him to hold.

Convinced, as we are, that there was a parol, or secret, trust as to Adeline and child and the provision for them of $20,000, and that that sum is included in the legacy to Lawrence Battle, the verdict given was erroneous, in declaring Bailey to have died testate as to all his property: it should have been a finding in favor of the will, except as to that sum in the hands of Lawrence Battle, and that, as to it, he died intestate.

We do not deem it necessary to order a new trial because the verdict is erroneous; but direct that the circuit Judge cause, by his order, the Ordinary to conform his judgment to this opinion, to wit: that Pierce Bailey died testate as to all his property except $20,000 in the hands of Lawrence Battle, as a trust for Adeline and child; and that, as said trust is void, that Pierce Bailey died intestate as to that amount, and that administration should be granted by the Ordinary to some one of the next of kin, other than Lawrence Battle,— as the money is in his possession,—that it may be collected and distributed according to law.